# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

JONATHAN MONSARRAT,

       Plaintiff,

       v.

BRIAN ZAIGER,

       Defendant.

)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.
1:17-cv-10356-PBS

## PLAINTIFF-IN-COUNTERCLAIM'S OPPOSITION TO THE SO-CALLED

## CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS

Marc J. Randazza (BBO# 651477)
RANDAZZA LEGAL GROUP, PLLC
P.O. Box 5516
Gloucester, Massachusetts 01930
Tel: (702) 420-2001
Email: ecf@randazza.com

Jay M. Wolman (BBO# 666053)
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Tel: (702) 420-2001
Email: ecf@randazza.com

*Attorneys for Defendant*
*Brian Zaiger*

RANDAZZA | LEGAL GROUP

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................................1

1.0   INTRODUCTION ...........................................................................................................1

2.0   FACTUAL BACKGROUND..............................................................................................3

3.0   LEGAL STANDARD........................................................................................................6

4.0   ANALYSIS......................................................................................................................6

  4.1   The DMCA Takedown Notice Harmed Mr. Zaiger ......................................................7

  4.2   Monsarrat Acted in Bad Faith and Did Not Consider Fair Use.....................................8

  4.3   Lack of Good Faith Basis............................................................................................9

   4.3.1   The Copyright Registrations are Not Presumptively Valid ..................................9

   4.3.2   The Alleged Works are Not Copyrightable by Monsarrat ..............................10

  4.4   The Postings on the JonMon Page Constitute Fair Use .............................................13

   4.4.1   The Use of the Alleged Works had Proper Purpose and Character ...........................13

    4.4.1.1   The Use of the Alleged Works was Non-Commercial...........................14

    4.4.1.2   The Use was Transformative......................................................................15

   4.4.2   The Alleged Works Lack the Requisite Creativity ..........................................17

   4.4.3   Only the Necessary Amount of the Alleged Works were Used to Criticize Monsarrat...........................................................................................................18

   4.4.4   The Alleged Infringement has No Effect on the Potential Market ...........................19

5.0   CONCLUSION ...............................................................................................................20

## TABLE OF AUTHORITIES

**CASES**

*Airframe Sys. v. L-3 Communs. Corp.*,
658 F.3d 100 (1st Cir. 2011) ................................................................9

*Bell Atlantic v. Twombly*,
127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)................................................6

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ........................................................................14

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884) ........................................................................11

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ...............................................................*passim*

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ..............................................................16

*Castle Rock Entertainment Inc. v. Carol Publishing Group*,
150 F.3d 132 (2nd Cir. 1998)..............................................................15

*Chi. Bd. of Educ. v. Substance, Inc.*,
354 F.3d 624 (7th Cir. 2003)..............................................................18

*CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*,
97 F.3d 1504 (1st Cir. 1996) ..............................................................12

*Commodity Trend Serv. v. Commodity Futures Trading Commission*,
149 F.3d 679 (7th Cir. 1998)..............................................................14

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ........................................................................11

*Curran v. Cousins*,
509 F.3d 36 (1st Cir. 2007) ................................................................6

*Custom Dynamics, LLC v. Radiantz LED Lighting, Inc.*,
535 F. Supp. 2d 542 (E.D.N.C. 2008) ......................................................10

*DeCosta v. CBS*,
520 F.2d 499 (1st Cir. 1975) ..............................................................11

*Dhillon v. Doe*,
2014 U.S. Dist. LEXIS 24676 (N.D. Cal. Feb. 25, 2014) ....................... 15, 16, 18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ........................................................................12

*Fitzgerald v. CBS Broad., Inc.*,
491 F. Supp. 2d 177, 185 (D. Mass. 2007) ........................................ 15, 17, 18

*Folsom v. Marsh*,
9 F. Cas. 342, 346, 1841 U.S. App. LEXIS 468 (1st Cir. 1841)..........................12

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ...................................................................10

*Harner v. Wong Corp.*, No. 1:12-cv-00820-KG-ACT,
2013 U.S. Dist. LEXIS 198954 (D.N.M. Oct. 31, 2013) ...........................................10

*Harper & Row, Publrs. v. Nation Enters.*,
471 U.S. 539 (1985) ..............................................................................13, 17, 19

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) ................................................................................13

*Johnson v. Gordon*,
409 F.3d 12 (1st Cir. 2005) ....................................................................................12

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ..................................................................................18

*L.L. Bean, Inc. v. Drake Publrs., Inc.*,
811 F.2d 26 (1st Cir. 1987) ....................................................................................16

*Lenz v. Universal Music Corp.*,
572 F. Supp. 2d 1150 (N.D. Cal. 2008) ...................................................................8

*Lenz v. Universal Music Corp.*,
815 F.3d 1145 (9th Cir. 2016) cert. denied 137 S. Ct. 416 (2016) ...........................8

*Martinez v. Hubbard*,
172 F. Supp. 3d 378 (D. Mass. 2016)........................................................................1

*Monsarrat v. Filcman, et al.*, Case. No. MICV2013-0399-C
(Middlesex Sup. Ct., Mass. Apr. 30, 2013) ..............................................................2

*Monsarrat v. Rosenbaum*, Case No. 1:11-cv-10248
(D. Mass. Feb. 1, 2012) ...........................................................................................2

*Monsarrat v. Rosenbaum*, Case No. 1:11-cv-10248
(D. Mass. Jan. 19, 2012) ......................................................................................1, 4

*Naruto v. Slater*, No. 15-cv-04324-WHO,
2016 U.S. Dist. LEXIS 11041 (N.D. Cal. Jan. 28, 2016)........................................11

*Natkin v. Winfrey*,
111 F. Supp. 2d 1003 (N.D. Ill. 2000) ..............................................................10, 11

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000) ..........................................................................13, 17, 18

*Oriental Art Printing, Inc. v. Goldstar Printing Corp.*,
175 F. Supp. 2d 542 (S.D.N.Y. 2001) ....................................................................10

*Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*,
533 F.3d 1287 (11th Cir. 2008) ..............................................................................13

*R.G. Fin. Corp. v. Vergara-Nunez*,
446 F.3d 178 (1st Cir. 2006) ....................................................................................6

*Reynolds v. Giuliani*,
2005 U.S. Dist. LEXIS 2743 (S.D.N.Y. Feb. 14, 2005) ..........................................19

*Righthaven LLC v. Hoehn,*
   716 F.3d 1166 (9th Cir. 2013)..........................................................................15

*Rossi v. Motion Picture Ass'n of Am.,* Inc.,
   391 F.3d 1000 (9th Cir. 2004)............................................................................8

*Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC,*
   560 F.3d 53 (1st Cir. 2009) ................................................................................9

*Soc'y of the Holy Transfiguration Monastery v. Gregory,*
   685 F. Supp. 2d 217, 227 (D. Mass. 2010) .....................................................15

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory,*
   689 F.3d 29 (1st Cir. 2012) ................................................................. 9, 14, 15, 19

*Sundeman v. Seajay Soc'y, Inc.,*
   142 F.3d 194 (4th Cir. 1998)............................................................................19

*Suntrust Bank v. Houghton Mifflin Co.,*
   268 F.3d 1257 (11th Cir. 2001)........................................................................17

*Thomson v. Citizens for Gallen Comm.,*
   457 F. Supp. 957 (D.N.H. 1978) ......................................................................13

*Tuteur v. Crosley-Corcoran,*
   961 F. Supp. 2d 333 (D. Mass. 2013)................................................................8

*Watterson v. Page,*
   987 F.2d 1 (1st Cir. 1993...................................................................................6

*Weissmann v. Freeman,*
   868 F.2d 1313 (2d Cir. 1989) ............................................................................9

**STATUTES**

17 U.S.C. § 101 ...................................................................................................10

17 U.S.C. § 107 ....................................................................................... 8, 13, 14, 19

17 U.S.C. § 112 .....................................................................................................8

17 U.S.C. § 401 .....................................................................................................9

17 U.S.C. § 410 .....................................................................................................9

17 U.S.C. § 510 .....................................................................................................7

17 U.S.C. § 512 ............................................................................................. 6, 7, 8

37 C.F.R. §202.1 ..................................................................................................12

**OTHER AUTHORITIES**

Compendium of the U.S. Copyright Office Practices § 313.2 (3d ed.) ....................................11

Harrison, Jeffrey L., "Privacy, Copyright, and Letters",
   3 Elon College L. Rev. 161, 171 n. 55 (2012) ....................................................................19

Jon Christian, "Everipedia is the Wikipedia for being wrong," The Outline (Oct. 4, 2017) .............2

Mike Masnick, "Bogus Lawsuit Plus Threats To Those Who Write About It Leads To Epic
   Response," Techdirt (May 17, 2013) ...............................................................................2

Stryker, Cole, Epic Win for Anonymous: How 4chan's Army Conquered the Web.
   (Overlook Press 2011) ....................................................................................................2

**RULES**

Fed. R. Civ. P. 12 .............................................................................................................6

Fed. R. Civ. P. 9 ...............................................................................................................6

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

**MEMORANDUM OF POINTS AND AUTHORITIES**

Jonathan Monsarrat is a litigation bully who uses lawsuits, threats of suits, and DMCA Takedown Notices, as a cudgel to silence lawful criticism of him. Now that Defendant Brian Zaiger has fought back, Monsarrat seeks to avoid his litigation obligations. His motion for judgment on the pleadings (Dkt. No. 90) must be denied.[1]

## 1.0    Introduction

Jonathan Monsarrat is a notorious figure in the Cambridge and Somerville region for being a serial harasser of young women. *See* Dkt. Nos. 53-1 & 53-4. In one instance, Monsarrat created an online dating site, targeting the Wellesley, MIT, and Harvard communities with a false appearance of official endorsement. He then used his administrator access to be fraudulently matched with and harass the women on the site.

In another instance, Monsarrat harassed a young woman named Hannah Rosenbaum in a very disturbing manner in an online chat. She rebuffed him and published her rebuff, including copies of their chats. Thereafter, someone created a page on Encyclopedia Dramatica memorializing this, quoting him and using pictures of him to parody and mock him (hereinafter the "JonMon page"). Rather than compete in the marketplace of ideas, he turned to abuse of the law to attempt to silence his critics.

First, in this Court, he sued Ms. Rosenbaum for copyright infringement regarding many of the so-called works originally claimed by Monsarrat in the instant suit. *See Monsarrat v. Rosenbaum*, Case No. 1:11-cv-10248 (D. Mass. Jan. 19, 2012). Monsarrat claimed, incredibly, that he owned the copyright a chat session between him and his victim, Ms. Rosenbaum.

---

[1]    Although the motion should be denied for failure to properly confer under Local Rule 7.1, as counsel for Monsarrat refuses to discuss any motion with Mr. Zaiger's counsel, it should be denied on the merits. However, consistent with this Court's practice, Mr. Goren should be required to actually confer in connection with any future motions. *See Martinez v. Hubbard*, 172 F. Supp. 3d 378, 385 (D. Mass. 2016) ("A Local Rule 7.1 certification is not an empty exercise. Local Rule 7.1 serves a meaningful dual role: it fosters discussion between parties about matters before they come before the court, and it preserves scarce judicial resources."). Mr. Goren was advised of this before filing his recent flurry of motions, yet he refused to give this Court's practice any due weight. *See* Exhibit 1.

Although the claim lacked merit, for the reasons discussed below, Ms. Rosenbaum failed to appear and a default judgment was entered against her. *Monsarrat v. Rosenbaum*, Case No. 1:11-cv-10248 (D. Mass. Feb. 1, 2012). Later, she retained counsel, and Monsarrat released his claim. *See* Exhibit 2. In settling in March 2014, Monsarrat learned that the JonMon page was created by an individual named Charles Hardin. *See* Exhibit 3.

Second, in the Massachusetts Superior Court, Monsarrat sued a journalist and the online Davis Square LiveJournal community that criticized him. This time, the criticism extended beyond romantic harassment to address a party he threw where underage children were served alcohol. See *Monsarrat v. Filcman, et al.*, Case. No. MICV2013-0399-C (Middlesex Sup. Ct., Mass. Apr. 30, 2013). His complaint went so far as to sue one defendant for merely mentioning the JonMon page, without more.[2] *Id.* The defendants' counsel picked apart the complaint before expensive litigation proceeded. *See* Mike Masnick, "Bogus Lawsuit Plus Threats To Those Who Write About It Leads To Epic Response," TECHDIRT (May 17, 2013).[3] Monsarrat was then represented by counsel who wisely advised him to dismiss that case with prejudice. *See Monsarrat v. Filcman, et al.*, Case. No. MICV2013-0399-C (Middlesex Sup. Ct., Mass. Jun. 5, 2013).

Encyclopedia Dramatica is "is an ad-supported cesspool of surreal troll humor founded by online provocateur Sherrod DeGrippo in 2004." *See* Jon Christian, "Everipedia is the Wikipedia for being wrong," THE OUTLINE (Oct. 4, 2017).[4] In 2011, Ms. DeGrippo disabled the website, but a team of individuals restored it from backups. Brian Zaiger was one of the team members and became an administrator. Among the thousands of pages restored was, incidentally, the JonMon page.

More than five years after Monsarrat could have attempted to sue Mr. Zaiger, he finally did so, once more claiming copyright infringement.[5] Not only, as argued by Mr. Zaiger, did Monsarrat

---

[2]    Encyclopedia Dramatica traces its origins to LiveJournal. *See* Stryker, Cole, Epic Win for Anonymous: How 4chan's Army Conquered the Web. (Overlook Press 2011).

[3]    Available at: <https://www.techdirt.com/articles/20130517/02413623115/bogus-lawsuit-plus-threats-to-those-who-write-about-it-leads-to-epic-response.shtml> (last accessed Jan. 31, 2018).

[4]    Available at: <https://theoutline.com/post/2369/everipedia-is-the-wikipedia-for-being-wrong?zd=2> (last accessed Jan. 31, 2018).

[5]    Monsarrat threatened to sue Encyclopedia Dramatica on January 9, 2013. Exhibit 4.

RANDAZZA | LEGAL GROUP

improperly claim infringement where there was lawful fair use, the Court found that the suit was untimely filed, and his claims were dismissed.  *See* Dkt. No. 79.

**2.0    Factual Background**

On or about November 9, 2016, Monsarrat sent a takedown notice pursuant to 17 U.S.C. § 512(c) of the Digital Millennium Copyright Act ("DMCA") to CloudFlare (hereinafter "the takedown notice").  *See* Dkt. No. 24 at p. 8, ¶ 7; see also Dkt. No. 1 at ¶ 24.  In the takedown notice, Monsarrat asked CloudFlare to give a notice of the infringement claim to Mr. Zaiger.  Dkt. No. 1 at ¶ 24.  Monsarrat alleged CloudFlare provided hosting and nameserver services.  *Id.* at ¶¶ 21-23.  The takedown notice included his sworn "attestation of the registration of copyrights" and allegations of "the continued and ongoing infringing display" of the works in which he claimed copyright.  *Id.* at ¶ 24. Monsarrat specifically claimed infringement in the five works he identified in his complaint against Mr. Zaiger.  *See* Exhibit 5; Exhibit 6.

The JonMon page on Encyclopedia Dramatica contained images and messages involving Monsarrat.  *See* Dkt. No. 61 and Dkt. No. 47-5 at pp. 24-32.  The first involved a June 2, 2000 photograph of Monsarrat in costume, with others, taken by a passerby, and published within a month thereof (hereinafter "Beaver photo").  Dkt. No. 58, First Amended Complaint ("FAC") at ¶¶ 2-3. Monsarrat did not register copyright in the Beaver photo until February 15, 2011.

Monsarrat alleged infringement in five other works, the first four of which, plus the Beaver photo, were subject of the takedown notice: (1) a series of text messages between himself as "mitcarpediem" and a user "willowfinna"; (2) an e-mail to an unknown woman stating "Hey! Let…. Ciao, bella!"; (3) an e-mail to willowfinna starting with "I'm laughing"; (4) photograph published by Monsarrat on one of his websites; and (5) a photograph of him having vandalized an electronic road sign.  *See* FAC ¶ 5 and Exs. C & D thereto; *see also* Exhibit 7.  The first three were messages between Monsarrat and his harassment victims.

Both the Beaver photo and the road sign photographs were "photoshopped", *i.e.* altered; the new Beaver photo reflected the Pedobear internet meme.[6]  *See* FAC ¶¶ 7-8.  The roadsign photograph was captioned "Jon Monsarrat reveals his core problem" and altered Monsarrat's own vandalism to read "Why cant [sic] Johnny date men." *See* FAC ¶ 7 & Exhibit 4.  This reflected Monsarrat's "[h]ebephile" reputation for pursuing underage women.  *See* FAC ¶¶ 9 & 17 and Ex. C & D.

The JonMon page first discussed a 2003 incident reported by the *Harvard Law Record* regarding a Valentine's Day dating website Monsarrat created in 2003.  Monsarrat created the site and abused his administrator access to match *himself* with numerous women, rather than make true matches.  FAC Ex. C.  In commenting on this "debacle," an e-mail sent by Monsarrat to an unknown woman appears:

> Hey!  Let me put it this way.  I'm a good judge of character.  You seem fantastic. I'd like to meet you.  Love that 'Up late talking and snuggling on the sofa' and 'Singing to me.'  Sure, I'll play guitar & sing for you. :)  I know you're busy and this whole dating thing feels like a burden.  Maybe we can change all that.  What have you got to lose?  Being romanced by a tall, fun, handsome gentleman will be quite nice! :)  Zing me a note and let's do a 'just coffee'.  When?  Or just email is fine if you're shy. My profile is below, and two pics are attached. :)  Ciao, bella! Jon

Ex. C.  This is one of the allegedly infringed "works."  Women approached the police on account of Monsarrat's abusive conduct, and the JonMon page comments on his predatory behavior.  *Id.*

The next section of the JonMon page describes his pursuit of a woman using the LiveJournal name "willowfinn."  She appears in a chat dialogue as "willowfinna".  *See* Ex. C.  The "willowfinn" pseudonym belonged to Hannah Rosenbaum.  *See Monsarrat v. Rosenbaum*, Case No. 1:11-cv-10248 (D. Mass. Jan. 19, 2012) (Affidavit of Monsarrat) (hereinafter "Monsarrat Affidavit").  They had a scheduled date, but then Mr. Monsarrat (four times) begged her, without prompting, not to cancel. *See* Ex. C.  Ms. Rosenbaum initiated an electronic chat with him ("mitcarpediem"), and he began imagining her excuses for cancelling the date; he was rude and condescending.  Monsarrat claims copyright in the following "literary" works, omitting her half of the conversation:

- HEyeyEyeyeyEY
- How's it going?
- That's good to hear

- I'll get the impression that you cancelled on short notice, which is rude, and I probably won't want to reschedule
- I'm just tired of the drama

---

[6]   An explanation of this meme is in Opposition to Plaintiff's Motion to Strike at pp. 3-4.

- Im doing great too, looking forward to seeing you
- one sec
- before you say anything you'll regret
- Are you sure you're too tired, too busy, too anxious, to see me for just one hour
- and that youd rather leave me with nothing to do on a Friday night leaving a pretty bad first impression?
- Frankly, so what if you're freaked out. Get a fucking grip.
- I'm so tired of women with drama
- It's like you're a little time bomb exploding whenever you feel "anxious"
- So you don't have much self-confidence, that's not my fault.
- Don't take it out on me.

*See* FAC ¶ 5 and Ex. C. Following his inability to keep the date, Monsarrat sent her an e-mail message:

> I'm laughing here because I know this game and I'm not falling a victim to it. First you feel anxious like the world is going to end. You like to call people "creepy" which is your way of saying you view the world as though it's full of freaks. Then you start to accuse the people around you. You really couldn't help yourself emailing me… (and I didn't email you) but then you accuse me of lacking restraint. Oh, the irony.
>
> I know this game. Everything in your life that's wrong is someone else's fault. If my email to you made you uncomfortable, why, it must be someone else's fault. I bet you're really good at complaining. It helps to prop up your ego that other people are worse than you and in the soap opera of your life, you are always right, and everyone else is always wrong. You are the victim.
>
> I know this game. If you write me again, I'm not going to read or respond.

FAC Ex. C.[7]

The fifth item alleged to have been infringed on the JonMon page appears to be the "Jonmon-pedowheel.jpg" photo referenced at ¶¶ 40-41 of the FAC. This relates to the discussion of Monsarrat's "The Question Wheel" project as a "Cr[y] for attention", "in which jonmon replies [to] your pathetic questions with immeasurably more pathetic answers." It also comments that "PedoJon is alive and well," with the exemplary answer from Monsarrat reading:

> Age doesn't matter.[8]
>
> Plenty of younger people just don't have their act together emotionally. And older people. Plenty of older people just don't get out much. And younger people. Focus on finding a partner who's good to you. What else matters as much? ☺ ♥ ♥

*See* Exhibit 7. The JonMon page concludes with a discussion of Mr. Monsarrat's arrest for hosting the underage drinking party and his abuse of the DMCA. *See* Ex. C.

---

[7] The webpage continues with a section called "Fetish Fun", focusing on Monsarrat's fake endorsement of his own website "Midnight Seduction". *See* Ex. C. No claims were made about it.

[8] The first line is difficult to decipher, but this is the most likely message in context.

Monsarrat had no good faith basis to send the takedown notice. The takedown notice interfered with the operation of Encyclopedia Dramatica and gave Mr. Zaiger distress that Monsarrat would file a frivolous copyright infringement claim. *See* Dkt. No. 24 at p. 8, ¶ 9. Unfortunately, Monsarrat compounded his threats conveyed via the takedown notice into actual litigation. *See* Dkt. No. 24 at p. 8, ¶ 10 and Dkt. No. 1. In fear of Monsarrat, Mr. Zaiger deactivated the JonMon page. *See* Dkt. No. 24 at p. 8, ¶ 9 and Dkt. No. 58 at ¶¶ 40-42.

### 3.0    Legal Standard

A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss.[9] *See Curran v. Cousins*, 509 F.3d 36, 43-44 (1st Cir. 2007). "Because [a Rule 12(c)] motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom…." *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006). Under *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007), to survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true…." *Id.* at 1965 (internal citation omitted). The Court may also give consideration "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). The documents referred to by Mr. Zaiger are either official public records or documents produced by Monsarrat.

### 4.0    Analysis

Monsarrat claims that the counterclaim should be dismissed because he claims Mr. Zaiger was not injured by the false takedown notice.[10] He also appears to contend that he need not have

---

[9]    It should be noted that Monsarrat generally contests the factual allegations in the counterclaim (Dkt. No. 31), so to the extent there is a dispute of fact, the allegations in the complaint should govern.

[10]    Although Monsarrat makes passing reference to Fed. R. Civ. P. 9(b)'s pleading rules, Mr. Zaiger is aware of no cases applying that rule to claims under Section 512(f) of the DMCA. However, even were it to apply, the heightened standard is met—the counterclaim specifies that the November

considered the fair use of the alleged works as part of his good faith investigation. Neither contention is accurate and the motion should be denied.

### 4.1     The DMCA Takedown Notice Harmed Mr. Zaiger

Monsarrat is liable to Mr. Zaiger for the misrepresentations in the takedown notice. The statute reads:

> (f)     Misrepresentations. Any person who knowingly materially misrepresents under this section—
> (1)     that material or activity is infringing, or
> (2)     that material or activity was removed or disabled by mistake or misidentification,
> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f). Monsarrat misconstrues the statute as requiring that Mr. Zaiger be injured "as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing." *See* Motion (Dkt. No. 90) at 7 quoting 17 U.S.C. § 512(f). He argues that, since CloudFlare did not remove or disable access to the webpage, Mr. Zaiger is not entitled to damages under the statute. Monsarrat is wrong.

In his original complaint, reflecting the takedown notice, Monsarrat primarily deemed Mr. Zaiger to only be liable for contributory copyright infringement. This comports with his knowledge that Mr. Zaiger, as an agent of Encyclopedia Dramatica, was merely an intermediary interactive computer service hosting the content created by Mr. Hardin. In fact, Monsarrat gave special attention to the fact that the only reason he believed Mr. Zaiger did not qualify for the safe harbor immunity from suit under 17 U.S.C. § 510(c) was because Encyclopedia Dramatica lacked a registered DMCA agent. *See* Dkt. No. 1 at ¶¶ 7 & 36. Thus, Mr. Zaiger, as administrator of Encyclopedia Dramatica, is not merely an "alleged infringer", he is also a "service provider" under the statute.

---

9, 2016 takedown notice contained the false information, *i.e.* that Monsarrat had a viable copyright claim.

As a service provider, Mr. Zaiger relied on the misrepresentations of Monsarrat, and removed the JonMon page, and thereupon secured counsel to advise him of his rights.[11]  Monsarrat still threatens frivolous prosecution should the page be republished, thus it has not been restored.

**4.2     Monsarrat Acted in Bad Faith and Did Not Consider Fair Use**

In sending his takedown notice, Monsarrat was required to make, under oath "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law."  17 U.S.C. § 512(c)(3)(A)(v).  First, as discussed below, there is no good faith basis that Monsarrat was a copyright owner in at least some of the materials.  Second, he failed to consider the fair use of the materials on the JonMon webpage.

In 2016, the Ninth Circuit Court of Appeals held "that because 17 U.S.C. § 107 created a type of non-infringing use, fair use is 'authorized by the law' and a copyright holder must consider the existence of fair use before sending a takedown notification under § 512(c)." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016) cert. denied 137 S. Ct. 416 (2016).  In reaching this holding, the Ninth Circuit observed that fair use is expressly authorized under Section 107, noting that it is not an affirmative defense, but rather a statement of what is not infringing conduct.  *See id.*  In reaching its holding, the Ninth Circuit analogized to other uses authorized by law, such as compulsory license, under 17 U.S.C. § 112, which a copyright owner must consider prior to sending a takedown notice.

Monsarrat relies on Judge Stearns's ruling in *Tuteur v. Crosley-Corcoran*, 961 F. Supp. 2d 333, 343-44 (D. Mass. 2013) for the consideration that fair use need not be considered.  However, Judge Stearns rejected the determination of the district court in *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008), giving it far less weight that what it believed the Ninth Circuit otherwise prescribed.  In fact, Judge Stearns heavily relied on *Rossi v. Motion Picture Ass'n of Am.*, Inc., 391 F.3d 1000 (9th Cir. 2004) as limiting the Northern District of California's ruling.  961 F. Supp. 2d at 343.  This is no longer good law after the *Lenz* decision.  Thus, as the Ninth Circuit now commands

---

[11]     Even as a mere "alleged infringer," no court in this Circuit has yet determined that the language "as the result of the service provider relying upon such misrepresentation" applies to all claims by an alleged infringer.  That qualifier could well be understood to only apply to service providers who suffer injury in the course of removing, disabling, replacing, or ceasing to disable access to material.

consideration of fair use, that holding should be given far more significant weight and *Tuteur* lacks persuasive authority.[12]   This Court should follow the Ninth Circuit's more recent and binding (in that circuit) holding and require Monsarrat to have *considered* fair use.

### 4.3     Lack of Good Faith Basis

Mr. Monsarrat, understandably, does not like the JonMon page.   After all, the entire page is one continuous string mocking him for his public misdeeds, including his legal misdeeds.   But, on their face, Monsarrat's claims in the takedown notice lack merit.   To make out a *prima facie* case of copyright infringement, "[i]n addition to the registration requirement, a plaintiff alleging copyright infringement has the burden of proving two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"   *Airframe Sys. v. L-3 Communs. Corp.*, 658 F.3d 100, 105 (1st Cir. 2011) quoting *Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009).   However, fair use "creates a privilege for others to use the copyrighted material in a reasonable manner despite the lack of the owner's consent." *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 59 (1st Cir. 2012) quoting *Weissmann v. Freeman*, 868 F.2d 1313, 1323 (2d Cir. 1989).   The alleged written works lack sufficient originality to be copyrightable and the webpage made lawful fair use of all of the alleged works.

### 4.3.1    The Copyright Registrations are Not Presumptively Valid

First, regardless of the question of fair use, Monsarrat lacked a good faith basis to assert copyright ownership.   To satisfy the first element, Monsarrat must have complied with all applicable statutory formalities.   Only a certificate of copyright registration made either before or within five years after the first publication is prima facie evidence of the validity of the copyright and the facts stated in the certificate.   17 U.S.C. § 410(c).   Monsarrat admits that none of the works in the takedown notice were registered within the five-year deadline set forth in 17 U.S.C. § 401(c).   *See* Dkt. No. 65 at p. 8.   Thus, Monsarrat is not entitled to a presumption of validity.

---

[12]    Monsarrat has been well aware of the *Lenz* decision, he mentioned Mr. Zaiger's contentions about it in his preliminary pretrial statement. Dkt. No. 33 at p. 4.   His failure to mention such authority to the Court now is troubling.

### 4.3.2   The Alleged Works are Not Copyrightable by Monsarrat

Monsarrat lacks a valid copyright to enforce.  His bits of writing are not sufficiently original and he is not the author of the Beaver photograph.  Monsarrat claims that the Beaver Photograph is of him.  *See* FAC ¶ 2.  He claims that it was taken at his "direction" and that he "composed the scene." *Id.*  Monsarrat is not author of the photograph, no matter his attempt to argue around that fact.  First, there is no written work for hire agreement nor of employment of the unnamed photographer.  *See* 17 U.S.C. § 101 (a work made for hire is "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.") Second, he is not a joint author.  It is well established that "a performance itself is not subject to copyright until it is captured in a fixed tangible form."  *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1011 (N.D. Ill. 2000) (rejecting Oprah Winfrey's claim of joint authorship in photograph of her, despite her contributions of "her facial expressions, her attire, the 'look' and 'mood' of the show, the choice of guests, the staging of the show, and so on."); accord *Garcia v. Google, Inc.*, 786 F.3d 733, 741-42 (9th Cir. 2015) (actress was not an author of a motion picture).

The photograph is purely utilitarian—it is to show Monsarrat in the costume interacting with random members of the public.  There are no protectible elements.  Being purely utilitarian, it is not copyrightable.  *See Harner v. Wong Corp.*, No. 1:12-cv-00820-KG-ACT, 2013 U.S. Dist. LEXIS 198954, at *17-18 (D.N.M. Oct. 31, 2013); *Custom Dynamics, LLC v. Radiantz LED Lighting, Inc.*, 535 F. Supp. 2d 542, 549 (E.D.N.C. 2008); *Oriental Art Printing, Inc. v. Goldstar Printing Corp.*, 175 F. Supp. 2d 542, 547 (S.D.N.Y. 2001).  Though Monsarrat claims to have staged the scene for the photograph to be taken, the scene is not the work.  Further, his claim that he composed the photo is clearly dishonest. For example, there is a tree branch in the foreground. and Monsarrat does not claim he told the photographer to capture that branch.  Thus, his position has zero support in fact or law.

If Monsarrat is an author, this case would establish the principle that when a group gathers to be in a photo, if someone says "stand here" then **that** is "authorship."  Imagine a large group photo, where multiple people tell others where to stand, where someone tells someone else where to move,

there could be as many competing claims to authorship as there are people in the photo.  Fortunately, we do not need to wrestle with such a reality, because the Copyright Act does not abide such an absurd result.

The unknown photographer, without any allegation as to any creative choice, snapped the same photo that any other passerby might have taken – and to the extent that copyright exists at all in the photo, it belongs to this unidentified photographer – not to a subject.  Although Monsarrat cites to *DeCosta v. CBS*, 520 F.2d 499 (1st Cir. 1975), for the proposition that a photograph of a person in costume is copyrightable, that issue was not actually before the First Circuit.  To the extent the Court considers the position of the Copyright Office, it should also remember that "the Copyright Office will not register … 'a photograph taken by a monkey'."  *Naruto v. Slater*, No. 15-cv-04324-WHO, 2016 U.S. Dist. LEXIS 11041, at *10 (N.D. Cal. Jan. 28, 2016) quoting COMPENDIUM OF THE U.S. COPYRIGHT OFFICE PRACTICES § 313.2 (3d ed.).  With all due respect to the photographer, he performed the same function as the monkey Naruto—taking a photograph without any consideration of its meaning.  Thus, the Court may find the Beaver photograph lacks sufficient originality.

Moreover, though Monsarrat says he is "at best a joint author" (Dkt. No. 65 at p. 10), he is in error.  He admits he is not the photographer.  In support of his position, he relied on an 1884 Supreme Court case to suggest he is the author because he essentially put the persons in position.  Dkt. No. 65 at p. 9, citing *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60–61 (1884).  Yet, not a single case in the intervening 133 years has stated that the subjects of a photograph, despite choosing how they should be posed, are joint authors.  Instead, the Supreme Court reshaped authorship in 1989, stating that an author is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."  *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  That means, the person who looked through the viewfinder and actually placed the work into a fixed, tangible medium.  And, not even Oprah Winfrey, despite posing herself, could show she was an author of a photograph she did not take.  *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1011 (N.D. Ill. 2000).  Monsarrat is not an author, let alone a joint one.  If the

photograph is copyrightable, it is an orphan work.  As a non-author, Monsarrat had no copyright and no good faith basis to send the takedown notice.

Monsarrat also claims copyright on his portion of a text-based conversation with Ms. Rosenbaum, as well as two e-mail messages and a sticky-note discussion of older people getting romantic with younger people.  None are properly copyrightable.  Monsarrat, at the July 18, 2017 Scheduling Conference, represented that copyright in such matter is protectable under *Folsom v. Marsh*, 9 F. Cas. 342, 346, 1841 U.S. App. LEXIS 468, *9-11 (1st Cir. 1841) (finding letters of George Washington copyrightable).  It is ironic that Monsarrat relies on *Folsom v. Marsh*, the case that laid the foundation for the "fair use" doctrine, discussed below.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 599 (1994).  Although modern copyright jurisprudence expounds on the fair use doctrine, it has diverged from the portion that permitted the finding of copyright in letters in 1841.

The chat log consists of a series of short phrases that are not copyrightable.  37 C.F.R. §202.1(a).  Since Monsarrat excludes the portion of the text by Ms. Rosenbaum, thereby not registering the entire dialogue as a single work, he has essentially registered a collection of short phrases.  *See CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996) ("[C]opyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection.")  Thus, it is not copyrightable subject matter.

The online dating messages are emails sent to less-than-interested romantic targets.  These works are unprotectable for lack of originality.  *See Johnson v. Gordon*, 409 F.3d 12, 19 (1st Cir. 2005) ("copyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or banal expressions of them").  Some letters might show sufficient originality and creativity to be worthy of copyright protection.  Nothing in the emails or sticky note are sufficiently original.  They are but a series of purportedly factual assertions.  As the Supreme Court held, "[s]ince facts do not owe their origin to an act of authorship, they are not original and, thus, are not copyrightable." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 342 (1991).  Thus, as the messages are not copyrightable, Mr. Zaiger would not be liable for infringement.

### 4.4     The Postings on the JonMon Page Constitute Fair Use

The central issue, and perhaps the most glaring one, is that of fair use.  *See* 17 U.S.C. § 107 ("notwithstanding the provisions of § 106 and § 106(a), the fair use of a copyrighted work … for purposes such as criticism [and] commentary … is not an infringement of copyright.")  The fair use doctrine exists so that First Amendment concerns can be balanced with the copyright act.  *See Thomson v. Citizens for Gallen Comm.*, 457 F. Supp. 957, 960 (D.N.H. 1978) ("Conflicts between interests protected by the First Amendment and the copyright laws can be resolved by application of the fair use doctrine.")  Fair use compels a court to avoid a strict application of copyright law when "it would stifle the very creativity which that law is designed to foster."  *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994).  Section 107 of the Copyright Act expressly reserves the right to fair use for the purposes of criticism and commentary.  17 U.S.C. § 107; *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) ("In fact, to the extent that the copying damages a work's marketability by parodying it or criticizing it, the fair use finding is unaffected."); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986) ("Section 107 expressly permits fair use for the purposes of criticism and comment.")

To decide whether use is "fair," courts weigh the following four statutory factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107; *see also Harper & Row, Publrs. v. Nation Enters.,* 471 U.S. 539, 561 (1985).  Fair use is "an equitable rule of reason; neither the examples of possible fair uses nor the four statutory factors are to be considered exclusive."  *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1308 (11th Cir. 2008).  Exhibit C and D to the FAC demonstrate that the JonMon page was fair use.

### 4.4.1   The Use of the Alleged Works had Proper Purpose and Character

The first factor for the Court to consider is whether the use serves as a non-profit education purpose as opposed to a commercial purpose, and the degree to which the use is "transformative."

*See Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 59-60 (1st Cir. 2012) (the court's "task under the first prong is to assess whether and to what extent the new work is 'transformative.'") This is guided by the examples in the preamble to § 107 of the Copyright Act. This preamble looks to whether the use is for criticism, comment, news reporting, and such. The key is whether the new work "merely supersedes the objects of the original creation (supplanting the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579 (internal citations and quotation marks omitted).

#### 4.4.1.1  The Use of the Alleged Works was Non-Commercial

Mr. Zaiger's alleged uses of the copyrighted so-called works were non-commercial. The entire JonMon page is clear criticism of and commentary of Mr. Monsarrat, his publicly-documented behavior, and his online dating practices (for want of a better term). The Copyright Act clearly states that criticism and commentary are fair uses that are not copyright infringement. *See* 17 U.S.C. § 107.

Monsarrat claims there is some commercial reason for creating this page, however, he misses the mark in doing so. He has highlighted the existence of advertising on the website being induced by the Beaver photo. Dkt. No. 65 at pp. 15-16. There is no sound basis to suggest the Beaver photo induces a visitor to click on an advertisement at the very bottom, rather than, say, all the intervening content or the independent content of the advertisement itself. Nor is there any connection between Mr. Hardin's initial publishing of the image and the advertising in 2008; in fact, various iterations of the JonMon page in the record do not contain the same types of advertisements.

Further, the mere existence of economic motivation does not transform a publication into commercial speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). Even if there is some financial gain to be reached through the use of these so-called works, that does not make it a commercial use. "If the result were otherwise, then even an editorial in The New York Times would constitute commercial speech because the newspaper seeks subscribers through advertisements." *Commodity Trend Serv. v. Commodity Futures Trading Commission*, 149 F.3d 679, 685 (7th Cir. 1998).

However, even if being ad-supported makes it commercial, the commercial nature of the use is outweighed by its transformativeness. *See Soc'y of the Holy Transfiguration Monastery v. Gregory*, 685 F. Supp. 2d 217, 227 (D. Mass. 2010) ("the more transformative the new work, the less significant are the factors that weigh against fair use, such as commercial gain.") citing *Campbell*, 510 U.S. at 579 . There is no dispute it is transformative—Monsarrat admits to alteration and captioning with critical commentary. Thus, commercial use is less significant, and no other factors weigh against a finding of fair use.

Moreover, Monsarrat had no good faith belief to lead to the conclusion that the alleged infringement itself was for Mr. Zaiger's commercial purpose, especially since Monsarrat is well aware that someone *other* than Mr. Zaiger created the page. *See* FAC ¶ 7 ("Sometime in or about 2008 some anonymous user" created the page). Monsarrat has no basis to suggest Mr. Hardin had a commercial purpose. Thus, Monsarrat failed to properly consider fair use.

### 4.4.1.2 The Use was Transformative

The second part of the first fair use factor asks the court to determine whether the defendant's use of the copyrighted material was "transformative." Transformative uses are those that take the copyrighted material and "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message…" *Campbell*, 510 U.S. at 579. To constitute transformative use, "the copyrightable expression in the original work [must be] used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings…" *Castle Rock Entertainment Inc. v. Carol Publishing Group*, 150 F.3d 132, 142 (2nd Cir. 1998); *see also Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d at 60.

There is no bright-line rule for whether something is transformative. *See Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 185 (D. Mass. 2007). Even making an exact copy of a protected work may be transformative, providing the copy serves a different function than the original work. *Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676 *13 (N.D. Cal. Feb. 25, 2014); *see also Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013) (vacated on other grounds).

Therefore, to evaluate whether Mr. Zaiger's uses were transformative, the Court can simply look at how Monsarrat used these works and how Encyclopedia Dramatic used them. At the outset, it must be noted that Monsarrat admits that ED is a "satirical website." FAC ¶ 6. As recognized by the Second Circuit Court of Appeals, "we do not analyze satire or parody differently from any other transformative use." *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013). As the First Circuit has observed, although "parody is often offensive, it is nevertheless deserving of substantial freedom – both as entertainment and as a form of social and literary criticism." *L.L. Bean, Inc. v. Drake Publrs., Inc.*, 811 F.2d 26, 33 (1st Cir. 1987) (internal quotation marks omitted). Monsarrat's admission alone should end the inquiry, but a review of the alleged infringements supports the conclusion that it is transformative satire.

Monsarrat does not show how he used the photographs, but it is certain that he did not use them to mock himself. The images complained of were "photoshopped." FAC ¶ 7. They were both "alter[ed]…with new expression, meaning, or message" rendering them transformative. *Campbell*, 510 U.S. at 579. By photoshopping them and adding captions, they were sufficiently altered to be transformative.

With respect to the dating communications and Question Wheel note, clearly Mr. Monsarrat used these in order to unsuccessfully attract uninterested women and to discuss his romantic opinion. However, here there is a completely different use than the attempt at successful romance. Monsarrat is quoted in order to mock him for harassing young women. It serves a very different function than its original use. If Monsarrat's theory were accepted, then nobody could ever quote anyone else in order to mock them. Could the Court imagine if Harvey Weinstein were able to sue any one of his accusers if they were to reveal harassing notes or email messages that he may have Weinstein sent them? The implications of failing to rule that this is *per se* fair use are horrifying. Otherwise, every victim must get a license from her harasser in order to comment publicly on his harassment and prove her claims to those who would doubt her.

The Court may draw similarities to the case of *Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676 (N.D. Cal. Feb. 25, 2014), in which a much less objectionable plaintiff owned the copyright to her

headshot, which she used for marketing and political campaigning purposes. *Id.* However, the defendant used that unaltered headshot to criticize the plaintiff's political views. *Id.* This was itself transformative.

> [T]he defendant used the headshot photo as part of its criticism of, and commentary on, the plaintiff's politics. Such a use is precisely what the Copyright Act envisions as a paradigmatic fair use. The Court finds that the defendant's use of the headshot photo was transformative because it served the purpose of criticism, rather than identification.

*Id* at \*15; *see also Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22-23 (1st Cir. 2000) (newspaper using studio photographs transformative when published with a story about a beauty contest controversy involving the model).

The website's use of these so-called works, such as they are, are transformative and for the non-commercial purpose of criticism and commentary. Accordingly, this first fair use factor of the nature and character of the use should weigh in favor of Mr. Zaiger and this court finding fair use.

### 4.4.2   The Alleged Works Lack the Requisite Creativity

The second factor in a fair use case "recognizes that there is a hierarchy of copyright protection" depending on the nature allegedly infringed work. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1271 (11th Cir. 2001). A court should look at two aspects of the copyrighted work when examining this factor: (1) whether the work at issue is creative or factual, giving creative works greater protection and fair use more likely to be found in factual works; and (2) whether the work was previously published. *See Harper & Row*, 471 U.S. at 563-64; *Fitzgerald*, 491 F. Supp. 2d at 187.

There is no dispute the works were "published" before Mr. Zaiger used them. Monsarrat published the photographs online, the Question Wheel note was published on its project, and the chat logs, and online dating emails were first published at least to the women who were the subject of Monsarrat's online harassment.

While writing and photography are creative endeavors, that does not mean that hese works would be found to be "creative works." In *Nunez*, despite the fact that the photographer chose certain factors in the headshot, they "could be categorized as either factual or creative" because they "were

not artistic representations designed primarily to express [the photographer's] ideas, emotions, or feelings..." *Nunez*, 235 F.3d at 23.   Similarly, in *Dhillon*, the headshot photo of Ms. Dhillon was informational.   As Judge Gertner wrote, "[c]reativity for the purposes of fair use is harder to establish than threshold copyrightability." *Fitzgerald*, 491 F. Supp. 2d at 188.

Here, the works are factual.   The photographs are mere snapshots, meant to record an event. Monsarrat admittedly is not even the one who photographed the Beaver photo—the photographer merely snapped it at his request, without any claim of the photographer having an artistic intent. Similarly, there is nothing artistic about the chat dialogue, Question Wheel note, or email messages in his failed romantic endeavors.   To the extent there is any creativity in his response to rejection, it is not apparent in these "works."

### 4.4.3    Only the Necessary Amount of the Alleged Works were Used to Criticize Monsarrat

The third factor in analysis looks at the amount and substantiality of the portion used in relation to the copyright work as a whole.   If they are "reasonable in relation to the copying's purpose," this will vitiate in favor of fair use. *Campbell*, 510 U.S. at 586.   As stated by the Seventh Circuit:

> The general standard, however, is clear enough: the fair use copier must copy no more than is reasonably necessary (not strictly necessary--room must be allowed for judgment, and judges must not police criticism with a heavy hand) to enable him to pursue an aim that the law recognizes as proper, in this case the aim of criticizing the copyrighted work effectively.

*Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003).   "If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2003).   This factor weighs less when considering photographs, "where all or most of the work often must be used in order to preserve any meaning at all – than a work such a text or musical composition, where bits and pieces can be excerpted without losing all value." *Fitzgerald*, 491 F. Supp. 2d at 188; *Nunez*, 235 F.3d at 24 ("to copy any less than [the whole picture] would have made the picture useless to the story").

Here, Mr. Zaiger allegedly republished Mr. Hardin's photoshopped Beaver photo.  Only as much of the original photo was copied as needed to illustrate the point that Monsarrat might be a person of concern.

Similarly, the use of the chat logs, the online dating exchanges, and Question Wheel note did not incorporate the entire written exchanges, but just enough of it to poke fun at Monsarrat's clearly unsuccessful dating approach.  By their own terms, the writings demonstrate that they are not to be read in isolation, but rather that they are part of a series of writings.  That Monsarrat may have only registered a portion of the exchanges serves to artificially reduce the denominator.  *See Reynolds v. Giuliani*, 2005 U.S. Dist. LEXIS 2743, at *15 (S.D.N.Y. Feb. 14, 2005) (finding that "alteration of the denominator [has] as profound effect on statistical comparisons").  Here, only a fraction of the works was used.

Even looking solely at the registered portions, although "[c]opying an entire work weighs against finding a fair use, however, it does not preclude a finding of fair use."  *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 205 (4th Cir. 1998).  Rather, "[t]he extent of permissible copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586-87.  As described above, the use was non-profit and satirical.  There is a well-known bit of advice to "never put in writing what you would not want to see on the front page of *The New York Times*."  Harrison, Jeffrey L., "Privacy, Copyright, and Letters", 3 Elon College L. Rev. 161, 171 n. 55 (2012).  This advice would be meaningless if critical inquiry could be quashed by a copyright claim.  Thus, this third factor weighs in favor of fair use.

### 4.4.4   The Alleged Infringement has No Effect on the Potential Market

Effect on the potential market is often the most important element in a fair use analysis.  There was no market, let alone adverse effect. The analysis of this factor requires a court to look at "the effect of the use upon the potential market or value of the copyrighted work."  17 U.S.C. § 107(4).  Courts evaluate the extent of market-harm caused by the alleged infringement and whether unrestricted similar conduct would result in an adverse impact on the potential market for the original.  *See Campbell*, 510 U.S. at 590; *Soc'y of the Holy Transfiguration Monastery, Inc.*, 689 F.3d at 64.  This is "undoubtedly the single most important element of fair use."  *Harper & Row*, 471 U.S. at 566.

There is no commercial use for a 14-year-old quote in an email exchange over an online dating site.  There is no market for his emails, chat dialogue, or Question Wheel answers; they are only of interest for the ridicule Monsarrat detests.  Neither is there any market for pictures of Monsarrat, especially where Monsarrat himself published them online without pleading he charged for access. The most telling factor is that Monsarrat has done every single thing he can do to suppress these works from being public.  Simply put, since 2000, Monsarrat has never tried to exploit them. Accordingly, there is no value for these works that could be affected by this fair use.

As set forth above, all of the fair use factors vitiate in favor of Mr. Zaiger.  The purpose was non-commercial and transformative, in that it served to criticize and satirize Monsarrat.  The alleged works are insufficiently creative.  Only the portions of the works necessary for the critique of Monsarrat was used.  And the use of the works have no possible effect on the non-existent market. Thus, as Monsarrat failed to properly consider fair use on a good faith basis, the takedown notice was in bad faith and he is not entitled to judgment on the pleadings.

## 5.0    Conclusion

Monsarrat is not entitled to judgment on the pleadings.  Mr. Zaiger, as a service provider, properly claimed he suffered injury on account of the takedown notice, being deprived of the ability to publish the page.  While some may ask "what is that worth?", the answer will be "what are anyone's First Amendment rights worth?"  We fought a revolution to have them.  To say "what is it worth" is a micturition upon the floorboards of Faneuil Hall and the slopes of Breed's Hill.

Monsarrat failed in his duty to send the takedown notice in good faith, as he had no proper belief he was a copyright owner and, more important, he failed to give due consideration to the fair use of the materials on the webpage.

WHEREFORE Mr. Zaiger respectfully requests this Honorable Court deny Defendant-in-Counterclaim's motion for judgment on the pleadings.

Dated: January 31, 2018.

Respectfully submitted,

/s/ Marc J. Randazza

Marc J. Randazza (BBO# 651477)
RANDAZZA LEGAL GROUP, PLLC
P.O. Box 5516
Gloucester, Massachusetts 01930
Tel: (702) 420-2001
Email: ecf@randazza.com

Jay M. Wolman (BBO# 666053)
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Tel: (702) 420-2001
Email: ecf@randazza.com

*Attorneys for Defendant*
*Brian Zaiger*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on January 31, 2018.

/s/ Marc J. Randazza
Marc J. Randazza